GRIFFITH COMPANY et al., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 74–2740.

United States Court of Appeals, Ninth Circuit.

Nov. 4, 1976.

As Amended on Denial of Rehearing and Rehearing En Banc April 5, 1977.

John H. Stephens (argued), Los Angeles, Cal., for petitioners.

Jay Shanklin, Atty. (argued), N.L.R.B., Washington, D.C., for respondent.

Robert M. Simpson (argued), of Rose, Klein & Marias, Wayne Jett (argued), Los Angeles, Cal., for intervenors.

Before ELY and WALLACE, Circuit Judges, and RENFREW,* District Judge.

WALLACE, Circuit Judge:

This petition for review of a National Labor Relations Board (NLRB) decision presents a fairly novel and important issue of labor law: whether a provision in a collective bargaining contract prohibiting an employer from subcontracting work to any other signatory employer who is delinquent in required payments to common employee fringe benefit trusts violates federal labor law. The NLRB held that the agreement is valid and enforceable. We disagree and reverse and remand for further proceedings.

## I. Factual Background

The three petitioners, Griffith Company, J.W. Nicks Construction Co. and Security Paving Co., Inc. (Griffith), are general construction contractors in southern California. Each is a member of a construction industry trade association which, jointly with two similar associations, negotiated a Master Labor Agreement effective July 1, 1969, to July 1, 1974, with the International Union of Operating Engineers, Local Union Number 12 (Union). The agreement covers hours, wages and working conditions for employees represented by the Union in eleven southern California counties. A large number of other employees have indi-

* Honorable Charles B. Renfrew, United States District Judge, Northern District of California, sitting by designation.

vidually negotiated "short form" agreements with the Union which incorporate by reference most of the terms and conditions of the Master Labor Agreement.

These agreements obligate the employers to make specified contributions to four employee fringe benefit trust funds created pursuant to 29 U.S.C. § 186(c)(5). These trusts collect approximately $5 million per month from over 2,500 employers for the benefit of 40,000 employees. Each trust pools the contributions from all employers into one account. An employee's eligibility for benefits is generally dependent on hours worked, but has nothing to do with whether his employer actually made contributions to the trusts. Thus if an employer fails to make the required contributions, all beneficiaries suffer reduced benefit levels but no employees are completely cut off from benefits.

Over the years, delinquent employer contributions have been a significant problem. All four trust funds have experienced some financial difficulty and some have had to reduce benefits. The trusts have implemented a number of means to deal with delinquencies. One of these means is the subject of this case.

Once an offending employer is discovered and after informal settlement attempts have failed, the employer's name is placed on a delinquency list which is circulated to signatory employers. Article I, Paragraph B–15 of the Master Labor Agreement (Paragraph 15) then provides that no employer shall subcontract any part of a job to any subcontractor on the delinquency list until such subcontractor has paid the delinquent amounts. Paragraph 16 provides that if an employer does subcontract to a delinquent subcontractor in violation of Paragraph 15, then the employer is liable for the delinquency. If a subcontractor becomes delinquent after commencing work, the employer is liable for the delinquency and must terminate the subcontract. If the employer does not pay the amounts due, the Union is given the right to withhold services.[1]

In early 1973, the trustees learned that Urban Pacific Construction Co. (Urban Pacific), a contractor who had signed a short form agreement with the Union and who was on the delinquency list, was doing subcontract work for Griffith and others. The administrator of the trust funds notified these contractors that they were liable for the delinquencies under the Master Labor Agreement. The trust's attorney made at least four telephone calls informing Griffith that if the delinquencies were not paid, the administrator would notify the Union of its right to withhold services from Griffith. Two of the contractors paid part of the delinquency; Griffith and some of the others did not. Part of the delinquency remaining unpaid, the administrator notified the Union that it had the right to withhold services from Griffith and the others who had not paid.

---

1. These parts of the contract read as follows:

15. The Trustees of the Trust Funds, through their Administrator, shall furnish each Contractors Association and the Union, with a list of delinquent Contractors each month. The Contractor agrees that he will not subcontract any portion of his job to any Contractor whose name appears on the delinquent list until such Contractor has paid all delinquent monies to the various Trust Funds.

(a) Any disputes between the parties concerning the payment or nonpayment of monies due the Trust Funds are not subject to Article V of the Agreement.

16. In the event the Contractor subcontracts to any such delinquent Subcontractor, in violation of the foregoing, the Contractor shall be liable to the Trustees for all accrued delinquencies of the Subcontractor and shall withhold sufficient funds from monies due or to become due such Subcontractor and shall pay the sums over to the Trust Funds. If a Subcontractor becomes delinquent after commencing work for the Contractor, the Contractor shall be liable for all delinquencies incurred on the job after ten (10) days following the date of the delinquency list on which the Subcontractor's name first appeared. The Contractor shall terminate the contract of the Subcontractor who fails to properly correct his delinquency.

(a) Where the Contractor fails or refuses to make payments required under the above provisions, the Union shall have the right to withhold services from any or all jobs of such Contractor.

 Griffith and two other contractors filed complaints with the NLRB charging that Paragraphs 15 and 16 of the Master Labor Agreement constituted an agreement to cease doing business with another employer in violation of section 8(e) of the National Labor Relations Act (Act), *as amended,* 29 U.S.C. § 158(e), and that certain threats to strike violated section 8(b)(4)(ii)(B) of the Act, 29 U.S.C. § 158(b)(4)(ii)(B). The trustees of the fringe benefit trust funds were permitted to intervene. After a hearing, an administrative law judge dismissed the complaints in their entirety. The NLRB, with two members dissenting, affirmed.[2] Griffith petitioned this court for review.[3]

## II. Contentions of the Parties

Section 8(e) of the Act provides generally that it is an unfair labor practice for a labor organization and an employer to enter into

an agreement whereby the employer agrees "to cease doing business with any other person." 29 U.S.C. § 158(e).[4] Section 8(b)(4)(ii)(B) of the Act provides that it is an unfair labor practice for a labor organization "to threaten, coerce or restrain any person" where an object is to force any person "to cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B).[5]

Griffith contends that Paragraphs 15 and 16 of the Master Labor Agreement violate section 8(e) by requiring Griffith to cease doing business with delinquent subcontractors. It also charges that the action of the trusts' administrator in notifying the Union of its right to withhold services and the acts of the trusts' attorney's informing Griffith that the administrator would take such action violated section 8(b)(4)(ii)(B) as threats with the object of forcing Griffith to cease doing business with delinquent subcontractors.

---

**2.** The NLRB's decision and order are published at 212 NLRB 343 (1974).

**3.** The petition for review was filed 79 days after the NLRB's order. The Union and the trustees argue that the petition was not filed within the 60-day period prescribed by 28 U.S.C. § 2107 for civil appeals where an agency of the United States is a party. But statutes are superseded by conflicting federal rules. 28 U.S.C. § 2072. Rule 4, Fed.R.App.P., contains provisions parallel to 28 U.S.C. § 2107, and Rule 20, Fed.R.App.P., provides that Rule 4 is not applicable to petitions for review of agency orders. Thus the 60-day limitation was specifically rejected. Rule 15(a), Fed.R.App.P., provides instead that a petition for review must be filed "within the time prescribed by law." Section 10 of the National Labor Relations Act, 29 U.S.C. § 160, does not specify such a time. Therefore, the Seventh Circuit has held that the doctrine of laches applies. The party challenging the timeliness of a petition must show that more time has elapsed than reasonably necessary and that it was prejudiced by the delay. *Kovach v. NLRB,* 229 F.2d 138, 141 (7th Cir. 1956). We adopt this standard and find that Griffith's petition was timely.

**4.** Section 8(e) provides in part:
(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer . . . agrees . . . to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to

such extent unenforcible and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: . . . .
29 U.S.C. § 158(e).

**5.** Section 8(b)(4) of the NLRA provides in part:
(b) It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike . . . .; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

. . . . .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, . . .: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

. . . . .

29 U.S.C. § 158(b)(4).

The administrative law judge and the NLRB both conceded that the challenged contractual provisions and the administrator's efforts to enforce them contemplated that signatory contractors such as Griffith would cease doing business with delinquent subcontractors such as Urban Pacific. They argued, however, that the statutes invoked prohibit not all agreements and threats with a cease doing business thrust but only so-called "secondary" activity. Because the activity in this case was found to be lawful "primary" activity and not secondary, Griffith's complaint was dismissed. The administrative law judge found, and the Union and the trustees contend, that the activity here came within the well-established "union standards" exception to section 8(e) and (b). The NLRB implicitly rejected this position but agreed with the administrative law judge's alternative ground that the activity came within a new exception sanctioned by broad language in *National Woodwork Manufacturers Association v. NLRB,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Therefore, the NLRB did not reach two other issues: whether section 8(e) should apply at all because of the provision excluding certain aspects of the construction industry [6] and whether the trust funds' administrator and the trust funds' attorney were agents of the Union for whose actions the Union is accountable pursuant to section 8(b)(4).

Responding to the conclusions of the NLRB, Griffith contends that the activity here was secondary, that the fringe benefit provisions in the contract are not permissible union standards clauses and that any new exception to section 8(e) for such clauses is not consistent with *National Woodwork.*

### III. Primary-Secondary Distinction

Section 8(b)(4) was added to the Act by the Labor-Management Relations Act of 1947, ch. 120, Tit. 1, § 101, 61 Stat. 141–42. The statute has been difficult to interpret because its language seems to reach traditionally accepted labor practices. For example, traditional picketing of struck primary employers seeks, as one object, to encourage individual employees of neutral employers not to cross the picket lines. Yet this activity seems to come within the statutory proscription of inducement to cease doing business with others. The Supreme Court held in *NLRB v. International Rice Milling Co.,* 341 U.S. 665, 672–73, 71 S.Ct. 961, 95 L.Ed. 1277 (1951), that the Act could not be read to diminish the traditional right to strike unless the diminution is specifically set forth and that no such specific provision in section 8(b)(4) reached such primary activity. Over the years the problem of secondary effects of primary activity received considerable attention from the courts and the NLRB. *See* ABA, The Developing Labor Law 617–40 (C. Morris ed. 1971).

In 1959 the Landrum-Griffin Act added a proviso to section 8(b)(4) making explicit Congress' intent not to prohibit otherwise lawful primary strikes and picketing,[7] Act of Sept. 14, 1959, Pub.L. No. 86–257, Tit. VII, § 704(a), 73 Stat. 542, and added section 8(e). *Id.* § 704(b), 73 Stat. 543.[8] Although the language of section 8(e) is as broad as that of section 8(b)(4) before the addition of the proviso, the courts and the NLRB have held that it also prohibits only agreements with a secondary aim. *National Woodwork Manufacturers Association v. NLRB, supra; NLRB v. Joint Council of Teamsters No. 38,* 338 F.2d 23, 28 (9th Cir. 1964); *Service Local 399,* 148 NLRB 1033 (1964).

Comprehensive general principles for distinguishing primary from secondary agreements are difficult to formulate. The courts have developed some fairly settled rules concerning the validity under section 8(e) of a number of specific types of con-

---

**6.** See note 4 *supra.*

**7.** See note 4 *supra.*

**8.** See note 4 *supra.*

tractual provisions. For example, "work preservation" as well as "union standards" clauses are generally held valid while "work acquisition" and "union signatory" clauses are not. See Goetz, *Secondary Boycotts and the LMRA: A Path Through the Swamp,* 19 Kan.L.Rev. 651, 683–92 (1971). But no such rules dealing with the provisions challenged here have been formulated.[9] The Union, trustees, administrative law judge and the NLRB each attempt to justify the clauses either by bringing them within specific rules developed for "union standards" clauses or by creating a new exception for "fringe benefit protection" clauses under general principles distinguishing primary from secondary activity.

### A. The *National Woodwork* Case

The leading case concerning the distinction between primary and secondary activity for purposes of sections 8(e) and 8(b)(4) is *National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357. There, Frouge, a general contractor working on a housing project in Philadelphia, was subject to a collective bargaining agreement between a local carpenters' union and a general contractors' association in which it was agreed that union members would not handle premachined doors. When Frouge ordered premachined doors for the project the union ordered its members not to hang them. Frouge then substituted "blank" doors which the carpenters fitted and cut at the jobsite. The National Woodwork Manufacturers Association, whose members make premachined doors, filed charges against

the union with the NLRB. It claimed that the union violated sections 8(e) and 8(b)(4)(ii)(B) of the Act by including the "will not handle" provision in the collective bargaining agreement and enforcing it. The union's defense was that the object of the "will not handle" clause was preservation of the carpenters' on-site work of fitting and cutting blank doors and that this is a primary object not forbidden by those sections. *Id.* at 616–18, 87 S.Ct. 1250.

The NLRB found no violation of either section but the court of appeals disagreed. The court noted that section 8(e) was inserted in the Act at the same time as the proviso that section 8(b)(4) would not apply to primary strikes or picketing. Finding no similar restriction in 8(e), it concluded that there was a violation of section 8(e) regardless whether the union conduct was primary or secondary. *Id.*

The Supreme Court began its analysis with an exhaustive review of the legislative history. The Court concluded that section 8(e) as well as section 8(b)(4) was not meant to prohibit primary activity. Both sections were directed only at secondary boycotts whose "core concept" is "union pressure directed at a neutral employer the object of which [is] to induce or coerce him to cease doing business with an employer with whom the union [is] engaged in a labor dispute." 386 U.S. at 622, 87 S.Ct. at 1257 (footnote omitted).

The Court noted the importance of technological change to labor-management relations and reasoned that any effort by Congress to curtail voluntary negotiations of solutions to these problems would be accom-

---

**9.** It appears that contractual provisions very similar to the ones involved here have been used in the southern California construction industry for some time. Such provisions have been involved in a number of cases before the NLRB. *General Teamsters Local 982,* 181 NLRB 515, 520 & n. 22 (1970), aff'd sub nom. *Joint Council of Teamsters No. 42 v. NLRB,* 146 U.S.App.D.C. 275, 450 F.2d 1322 (1971); *Southern California Dist. Council of Hod Carriers Local 345,* 158 NLRB 303, 308–10 (1966); *Orange Belt Dist. Council of Painters No. 48,* 153 NLRB 1196, 1197 (1965), aff'd, 124 U.S. App.D.C. 349, 365 F.2d 540 (1966); *Los Ange-*

*les Bldg. & Constr. Trades Council,* 150 NLRB 1590, 1597 (1965); *Cement Masons Local 97,* 149 NLRB 1127, 1130 n. 4 (1964); *Los Angeles Bldg. & Constr. Trades Council,* 145 NLRB 279, 281 (1963). None of these decisions, however, determined the validity of these clauses in a factual context similar to this case. *In General Teamsters Local 982, supra,* the NLRB noted that the clauses are not clearly unlawful on their face and, in the absence of evidence concerning the terms of the trust contributions and expenditures, dismissed that part of the complaint. 181 NLRB at 520, 524.

panied by extensive study and debate. *Id.* at 640–42, 87 S.Ct. 1250. The Court also stated that the provisions of the Act guaranteeing labor the rights to bargain collectively and to strike except as specifically provided in the Act, 29 U.S.C. §§ 157, 163, "caution against reading statutory prohibitions as embracing employee activities to pressure their own employers into improving the employees' wages, hours, and working conditions." *Id.* at 643, 87 S.Ct. at 1268.

In *National Woodwork* the determination whether a particular agreement and its enforcement violated sections 8(e) and 8(b)(4) required "an inquiry into whether, under all the surrounding circumstances, the Union's objective was preservation of work for Frouge's employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere." *Id.* at 644, 87 S.Ct. at 1268 (footnote omitted). In making this inquiry, the Court focussed on two factors: (1) "the tactical object of the agreement and its maintenance," *i. e.,* whether the union means to influence the labor relations of the signatory ("boycotting") employer or to interfere with the labor relations of others (the "boycotted" employers); and (2) the allocation of the benefits of the agreement, *i. e.,* whether they accrue mainly to the boycotting employees or other employees of the primary employer on the one hand, or, on the other, to members of the union generally. *Id.* at 645, 87 S.Ct. 1250, 1268. The Court concluded: "The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-a-vis* his own employees."[10] *Id.* (footnote omitted).

The Court had no trouble concluding that the "will not handle" provision at issue in

*National Woodwork* and its enforcement were lawful primary activity. The finding of the trial examiner, adopted by the NLRB, was that the purpose of the clause was preservation of work traditionally performed by jobsite carpenters, a primary motive. This finding was supported by substantial evidence. *Id.* at 645–46, 87 S.Ct. 1250.

### B. Application of *National Woodwork*

The administrative law judge found that the fringe benefit clauses at issue here were "clearly designed" to allow the trust fund's administrator and prime contractors to "pressure" delinquent subcontractors to remedy their delinquencies and to protect trust fund benefits by making other responsible parties liable for all delinquencies. The NLRB did not expressly adopt or reject these findings. It conceded that the clauses contemplate that signatory contractors would cease doing business with delinquent subcontractors but justified the clauses as helpful in protecting the fringe benefits of all employees of all signatory employers. Implicit in the NLRB's decision is a finding that the object of the clauses is to reduce delinquencies and thereby to improve fringe benefits for the trust funds' beneficiaries by requiring other employers to boycott delinquent subcontractors.

We conclude that these are secondary motives. Our course is clear when we apply the two keystone factors of *National Woodwork.* Examining first the tactical object of the boycott, it is obvious that the Union is not attempting to influence the labor relations policy of Griffith, the boycotting employer, but is instead trying to interfere with the labor relations policy of the boycotted employer, Urban Pacific. It is Ur-

---

**10.** The Union and trustees place too much emphasis on the general conclusory language, ignoring the two more specific factors considered by the Court. The parties also relied heavily on language from circuit court opinions stressing whichever of the two specific factors seemed to weigh most heavily in their favor. *See, e. g., Orange Belt Dist. Council of Painters No. 48 v. NLRB,* 117 U.S.App.D.C. 233, 328 F.2d 534, 538 (1964) (clause is primary if it directly benefits covered employees); *NLRB v.*

*Joint Council of Teamsters, No. 38, supra,* 338 F.2d at 28 (clause is secondary if directed at third-party employers). These cases and the others cited are consistent with the results from an analysis of the two factors considered by the Court in *National Woodwork.* For a summary of how the lower courts weigh these two factors, see Note, *A Rational Approach to Secondary Boycotts and Work Preservation,* 57 Va.L.Rev. 1280, 1297–1300 (1971).

ban Pacific with which the Union has a dispute over alleged delinquencies in trust fund contributions. Griffith's only offense lies in doing business with Urban Pacific.

The NLRB ignored this interference with Urban Pacific's labor relations and focused solely on the second *National Woodwork* consideration: the allocation of benefits of the boycott. In fact, the NLRB viewed the "critical question" as whether the agreement "was substantially in the interest and for the protection of the employees of [all contracting] employers." The NLRB then reasoned that since delinquencies cause all such employees to suffer reduced fringe benefits, the clauses which are designed to combat the delinquencies meet this test.

But this reasoning allows the Union to cast its protective net too widely. As the NLRB recognized, primary activity must confer benefits on the members of a relevant "work unit" and not on some larger group such as members of the Union generally. But the NLRB adopted the administrative law judge's conclusion that the relevant work unit here is equivalent to the respective bargaining unit. But even if we adopted the bargaining unit measure, which we specifically do not,[11] we could not agree with the NLRB that the activity here is primary. The NLRB erred in omitting con-

sideration of the employees who are beneficiaries of the trust fund but are not members of the same bargaining unit which negotiated with Griffith. There are a handful of large multi-employer union bargaining units (which negotiated the Master Labor Agreement with the large contractors associations) and a large number of single-employer union bargaining units (which negotiated short form agreements with individual contractors). Thus the critical question is not whether the agreement was substantially for the benefit of the employees of all contracting employers, as the NLRB phrased it, but whether the agreement was substantially for the benefit of the employees in Griffith's employees' work unit as opposed to the members of the Union generally.

This question must be answered in the negative. Employees of many work units are beneficiaries of the trust funds and the burdens of delinquencies in trust fund contributions are shared equally by all. By withholding services from contractors doing business with delinquent subcontractors with the object of eliminating those delinquencies, the Union seeks to benefit not only the contractors' work unit, but all its members who may become eligible to receive funds from the trusts. The NLRB did point out that the clauses challenged

---

**11.** The administrative law judge considered this issue at some length. The parties offered various proposals ranging from work units limited to the employees of one employer to one industry-wide work unit. The administrative law judge held, however, that prior NLRB decisions dictated that the relevant work unit be equivalent to the corresponding bargaining unit. *See Raymond O. Lewis*, 148 NLRB 249, 253–54 (1964), *remanded sub nom. Lewis v. NLRB*, 122 U.S.App.D.C. 18, 350 F.2d 801 (1965), *on reconsideration sub nom. W. A. Boyle*, 179 NLRB 479 (1969), *petition for review dismissed as moot sub nom. UMW v. NLRB*, 152 U.S.App.D.C. 82, 468 F.2d 1139 (1972); *but see* Note, *A Rational Approach, supra* note 10, 57 Va.L.Rev. at 1291–97. The NLRB accepted this ruling and it has not been challenged on review.

The administrative law judge may have misused the work unit concept. Work units have in the past been defined solely for use in considering the allocation of benefits of a challenged labor practice: in order for the practice

to be considered primary, it must benefit mainly employees in the work unit (although not necessarily employees of the employer against whom the action is taken). *See id.* at 1290–94. However, the administrative law judge seemed to apply the concept in considering the tactical object of the Union's action. He apparently assumed that if two employers contract with the same bargaining unit, the Union may coerce one into ceasing to do business with the other where the object is interference with the labor relations of the other regardless of the allocation of benefits. On the basis of this assumption, he thought it would be anomalous to rule the boycott of Urban Pacific illegal since the Union would still be allowed to coerce Griffith into boycotting delinquent contractors in Griffith's bargaining unit. The propriety of the administrative law judge's assumption is not before us and we express no opinion on it. We note only that there is no precedent for this surprising assumption and that we consider it an open issue.

here may not benefit Union members generally because unemployed Union members who do not qualify for fringe benefits may not have an interest in seeing that delinquencies are remedied. But we do not think that this is an important factor.

What is critical is that the benefits sought to be achieved by the clauses extend far beyond the relevant work unit and that the benefits conferred on the work unit are no more "direct"[12] or substantial than those conferred on the other units.[13] Thus we

12. We reject the NLRB's argument that the "directness" of the effect on the work unit employees is decisive. The NLRB argues that the effect of Urban Pacific's delinquency on Griffith's employees' fringe benefits is more direct than the effect of subcontracting unit work in violation of union standards or work preservation clauses which have been held primary. But we do not read *National Woodwork* as requiring any metaphysical inquiry into the relative degrees of directness of causation. Some commentators have distinguished between direct and indirect benefits to unit employees in distinguishing primary from secondary activity, *see, e. g.,* Note, *A Rational Approach, supra* note 10, 57 Va.L.Rev. at 1298; Aaron, *The Labor-Management Reporting and Disclosure Act of 1959,* 73 Harv.L.Rev. 1086, 1119 (1960), but they use the terms differently from the NLRB. An effect is "direct" if the bargaining unit is benefited in some special way and "indirect" if the bargaining unit is benefited only because of some general benefit conferred upon the union. Under this scheme, the effects on Griffith's employees of Urban Pacific's delinquencies are, if anything, less direct than in the work preservation and union standards cases because the effect on them is no different from the effect on all other employees who are beneficiaries of the trusts.

13. The administrative law judge found, and the Union and the trustees argue on review, that the agreement here comes within the well-established exception to section 8(e) for union standards clauses. The NLRB was correct in not relying on this ground.

A typical union standards clause prohibits subcontracting of unit work to any employer whose employees' wages, hours and working conditions are less favorable than those enjoyed by the union. Such clauses are generally held primary because they are usually designed to protect the wages and conditions achieved by the union in bargaining and to preserve unit work by removing the incentive for the employer to subcontract unit work to "sub-standard" contractors in order to avoid paying union terms. *See, e. g., Teamsters Local 413 v. NLRB,* 118 U.S.App.D.C. 149, 334 F.2d 539, 548, *cert. denied,* 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); *see generally* Goetz, *Secondary Boycotts, supra,* 19 Kan.L.Rev. at 690–92; ABA, Labor Law, *supra,* 658–64.

The administrative law judge concluded that Paragraphs 15 and 16 of the Master Labor Agreement "realistically do function as union standards clauses." He noted that an employ-

er who does not intend to make required trust fund contributions can bid lower for subcontracts than one who intends to make the payments. By making prime contractors liable for their subcontractors' delinquencies, he reasoned that the Master Labor Agreement cancels the delinquent employer's bidding advantage and removes the economic incentive to contract with such employers. Thus he held that the clauses preserve the work of the employees of the prime contractors and non-delinquent subcontractors and protect the fringe benefits of all.

It is clear to us, however, that these are not primary union standards clauses. First, a primary clause seeks to protect only work traditionally performed by the unit. Here there is no contention that the work subcontracted to Urban Pacific was ordinarily accomplished by Griffith's employees and the administrative law judge did not so find. He found that the Union's motive was to protect the work not only of Griffith's employees' work unit, but of the employees of all non-delinquent employers, generally a secondary objective.

Moreover, we doubt that the record supports the administrative law judge's conclusion that the Union seeks to preserve work for employees of non-delinquent employers at the expense of employees of delinquent contractors. The latter are Union members too and the Union should be as desirous of protecting their work as the work of the employees of nondelinquents. Indeed, the Union's policy of protecting the fringe benefit eligibility of the delinquent contractors' employees is inconsistent with the desire found by the administrative law judge not to protect those same employees' jobs.

For similar reasons, we do not find much assistance in decisions involving the much-litigated "80-cent clause" of the 1964 amendment to the National Bituminous Coal Wage Agreement of 1950. That clause required employers to contribute to fringe benefit trusts 40 cents per ton of coal produced and 80 cents per ton of coal acquired from non-union producers. The NLRB upheld the provision as a primary union standards clause since it found that the 80-cent surcharge was roughly equivalent to the differential between union and non-union wages and that the union's object was to remove the incentive for substituting coal purchased from non-union mines for coal previously mined by the union. *United Mine Workers,* 188 NLRB 753, 754 (1971), *petition for review dismissed for lack of jurisdiction,* 152 U.S.App.

conclude that the agreements and their enforcement constitute unlawful secondary activity.

■ The NLRB stressed, however, the desirability of fringe benefit programs. Borrowing some language from *National Woodwork,* see 386 U.S. at 642, 87 S.Ct. at 1267, the NLRB concluded that it "should not lightly impute to Congress in Section 8(e) an intent to hinder or impede such necessary and commendable efforts to guarantee employees these ancillary benefits." But the reasoning of *National Woodwork* does not support this conclusion. We do not read it as construing section 8(e) to prohibit only secondary activity for undesirable or reprehensible ends. Congress has over the years struck a delicate balance of power between labor and management. Unions may engage in concerted coercive activities against primary employers only; secondary pressures are forbidden even where a union has the commendable objective of improving the wages and working conditions of union members generally.

■ Nor do we understand how the clauses challenged here are "necessary" to guarantee the employees maximum fringe benefits. The Union argues that many delinquent employers are "fly-by-night" enterprises which do business out of post office boxes and often change their names and locations to avoid suits to enforce their contractual obligations. The Union notes that when the Urban Pacific delinquency was first discovered, Urban Pacific could not be found. It is indeed difficult to bring

*any* pressure, primary or secondary, on an elusive delinquent employer, but once Urban Pacific was discovered working on Griffith's construction site, primary and secondary pressures both became possible and there is no reason why secondary pressures were necessary.[14] The Union had the right to withhold its services from Urban Pacific, although it did not exercise that right here, and such a primary strike should be as effective in inducing Urban Pacific to cure its delinquency as the secondary pressures threatened in this case. Alternatively, the Union could have brought suit for the delinquency once Urban Pacific was located. Finally, the Union could avoid dealing with the "fly-by-night" subcontractors altogether. At the very least, the Union could ask them to disclose their business address and telephone number and the names and addresses of their principal officers, to designate a reliable agent for the service of process, or to post a security bond for fringe benefit contributions before agreeing to supply union labor.[15]

■ In short, we see no reason for creating a new exception to section 8(e) for secondary fringe benefit trust contribution enforcement clauses beyond the narrow exception created by a bare majority of the Supreme Court for primary work preservation clauses in *National Woodwork.*

## IV. Remaining Issues

■ Since the NLRB concluded that the clauses and their enforcement were lawful

D.C. 82, 468 F.2d 1139 (1972). The Sixth Circuit disagreed. It concluded that there could be no work preservation motive since the employer could comply with the clause by firing all its employees and buying all its coal from other signatory mines. It thought instead that the union sought by the clause to induce non-union mines to become unionized, a secondary motive. *Riverton Coal Co. v. UMW,* 453 F.2d 1035, 1040–41 (6th Cir.), *cert. denied,* 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972).

Each party relies heavily on whichever of these cases supports its respective position, but even if we were to accept the view of the NLRB, which we specifically do not decide, it would make no difference here because the 80-cent clause is distinguishable. Because the

80-cent penalty was imposed on coal produced from non-union suppliers, it is at least arguable that the union's motive is protection of unit work. But here the Union's object is not protection of unit work, but remedying the default of a third-party contractor. This is a secondary object.

14. An example of a less coercive method was given tacit approval by the Supreme Court in *Walsh v. Schlecht,* —— U.S. ——, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977).

15. A performance bond is a permissive bargaining subject. The union can therefore ask employers to post a bond which will be legally enforceable. Bonding is not a mandatory subject, however, and the union cannot insist on a

primary activity, it did not reach a number of other issues raised by the parties. The Union and the trustees argued that even if the clauses are secondary, they are valid under the construction industry exception to section 8(e).[16] Because clauses within the proviso may be enforced only by judicial means and not by economic coercion, *NLRB v. IBEW Local 769*, 405 F.2d 159, 163 (9th Cir. 1968), *cert. denied*, 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed.2d 237 (1969), this is a defense only to the charge of violating section 8(e) and not 8(b)(4). Griffith responds that the proviso sanctions only clauses which require subcontractors to be parties to contracts with the Union and not those which require that they be in compliance with such contracts. Griffith also notes that a clause otherwise within the proviso is invalid if it provides for union self-help in enforcement. *Id.* at 163–64. As the NLRB should have the opportunity to consider these issues first on remand, we do not reach them at this time.

With respect to the section 8(b)(4) charge, the Union and the trustees argue that the only threats alleged were made by the trust funds' administrator and attorney who are not the Union's agents. They note that the trust funds are administered by trustees drawn equally from labor and management pursuant to 29 U.S.C. § 186(c)(5) and that employees of the trustees are held to the same fiduciary duties to the beneficiaries of the trusts as the trustees. Thus they urge that the trustees and their employees are not agents of the Union. The NLRB will have to consider this issue on remand.

The NLRB's decision that the agreements and their enforcement are lawful primary activity is reversed and the case is remanded to the NLRB for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

bond to the point of an impasse in the negotiations and cannot strike over the issue. *NLRB v. Hod Carriers Local 1082*, 384 F.2d 55 (9th Cir. 1967), *cert. denied*, 390 U.S. 920, 88 S.Ct. 853, 19 L.Ed.2d 980 (1968).

**16.** See note 5 *supra*.