**Norman L. BUCHANAN, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Truck Drivers, Helpers, Taxicab Drivers, Garage Employees and Airport Employees Local Union No. 355, Intervenor.**

**No. 78–1231.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1979.

Decided April 20, 1979.

Theodore L. Chandler, Jr., Richmond, Va. (Samuel W. Hixon, III, Richmond, Va., on brief), for petitioner.

Michael Murchison, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Janet C. McCaa, N. L. R. B., Washington, D. C., on brief), for respondent.

Luther C. West, Baltimore, Md. (Bernard W. Rubenstein, Carl S. Yaller, Edelman, Levy & Rubenstein, P. A., Baltimore, Md., on brief), for intervenor.

(Christopher G. Gillam, Lawrence D. Levien, Richard N. Appel, Akin, Gump, Hauer & Feld, Washington, D. C., on brief), for amicus curiae Monarch Institutional Foods Co.

Before HALL and PHILLIPS, Circuit Judges, and JACK R. MILLER, Judge, United States Court of Customs and Patent Appeals, sitting by designation.

MILLER, Judge:

This case involves a petition by Norman L. Buchanan ("Buchanan") for review of a decision and order of the National Labor Relations Board ("NLRB") on the question of fair representation by the Intervenor Truck Drivers, Helpers, Taxicab Drivers, Garage Employees and Airport Employees Local Union No. 355 ("Union"). The Administrative Law Judge ("ALJ"), acting on a complaint filed by the General Counsel of the NLRB ("GCNLRB") ruled that the Union had violated section 8(b)(1)(A) of the National Labor Relations Act (29 U.S.C. § 158(b)(1)(A)) in its representation of Buchanan by failing to invoke a two-week

notice provision, which was a condition precedent to arbitration, under the Union's collective bargaining agreement with Monarch Institutional Foods ("Monarch").[1] The ALJ directed, *inter alia*, that the Union proceed promptly to arbitration, pay reasonable counsel fees so that Buchanan could employ independent counsel to represent him at the arbitration, and make Buchanan whole for loss of earnings for the period November 20, 1975, the date of his discharge, until the Union demanded arbitration. The NLRB found that the two-week notice provision had "atrophied" and ruled that the Union's efforts to obtain reinstatement of Buchanan satisfied its duty of fair representation, reversed the decision of the ALJ, and dismissed the complaint filed by the GCNLRB. We affirm.

### Background

Buchanan, a truck driver, was hired by Monarch on March 7, 1974, and assigned to make deliveries on the Washington, D. C., run. He was notified by Monarch on November 20, 1975, by telephone and by a letter to the Union's business agent,[2] of his immediate discharge because of alleged misconduct in working excessive overtime on the night of November 19, 1975, and because there was an unauthorized passenger on his truck. At all times during the period of his employment, the collective bargaining agreement between the Union and Monarch contained Article 21, which provided as follows:

21) In the event the Company desires to discharge an employee for any reason other than alleged dishonesty, or the use of intoxicants while on duty, the Company shall notify the Union by registered mail two (2) weeks prior to the effective day of such discharge and of the reason

therefore [sic]. If the Union challenges the reason for discharge, it shall notify the company to that effect within forty-eight (48) hours after receipt of notice of discharge. Thereupon, an attempt shall be made to adjust the matter by negotiations, provided however, that if negotiations are ineffectual in settling the dispute, then the parties shall proceed to arbitration as provided for in Article 22 hereof.

The discharge shall not become effective pending arbitration.

In the event the reason for the discharge is alleged dishonesty, or the use of intoxicants while on duty, an employee may be summarily discharged provided however, that the Company shall immediately notify the Union by registered mail of such discharge and of the reason therefore [sic]. If the Union challenges the reason for the discharge it may request arbitration as provided for in Article 22 herein. The arbitrators shall render their decision within three (3) days after the matter has been submitted to them.

In the event the arbitrators decide in favor of an employee, the employee is to be reinstated and reimbursed in full for all time lost in connection with such dismissal.

According to Monarch's warehouse supervisor, Buchanan was an inefficient employee, who frequently became lost, made errors in deliveries, and accumulated an excessive amount of overtime,[3] and he had complained several times to the Union's business agent and to Buchanan himself about these matters. Nevertheless, because Buchanan was likeable and because the Union's business agent encouraged the warehouse supervisor to try to work things out, Monarch continued his employment. Ac-

---

1. Monarch has filed an amicus curiae brief.

2. The letter, signed by Monarch's warehouse supervisor, stated that Buchanan was terminated immediately because, "in direct defiance of my directions, Mr. Buchanan remained on his delivery route for five (5) hours and thirty-eight (38) minutes beyond the limit I set." The letter also stated: "in my opinion this defiance was in fact an actual theft of the dollars being paid

for those hours." Regarding the latter, the warehouse supervisor testified that he did not really contend that Buchanan had been dishonest.

3. It appears that he had worked overtime in all but five weeks of his employment and in excess of ten hours per week overtime in thirty weeks of his employment.

cording to the night supervisor, Buchanan on several occasions left merchandise at the wrong stop and took too much time, so that he was assigned to servicing trucks for one two-week period. The Union's business agent corroborated the warehouse supervisor's statement regarding complaints about Buchanan's performance and testified that he had passed the complaints on to Buchanan. Buchanan denied having received any complaints about his work and declared that on several occasions he had been complimented by management. It appears that he received no written warnings or reprimands.

Later in his employment, Buchanan was transferred to delivery routes in the Maryland-Pennsylvania area. On November 19, 1975, Buchanan was assigned a route in Pennsylvania commencing at 6:00 a. m. He testified that he had trouble locating the stops along his route, of which there were some twenty-four; that he had made only nine deliveries by 2:00 p. m., when he met a Monarch salesman, who said that Buchanan would never complete his deliveries. The salesman spotted a person he assumed to be a "helper" on Buchanan's truck. He telephoned the warehouse supervisor to inform him that Buchanan would not be able to complete all of his stops and to mention the "helper." The warehouse supervisor left word at the next stop for Buchanan to call in. He did so and was instructed to continue his run, but not to remain out after 7:00 p. m. He was asked about the "helper," since truck drivers were not allowed to have unauthorized passengers, and Buchanan was not provided with a "helper." The warehouse supervisor testified that Buchanan told him that he had picked up the passenger and then put him off. The instruction to return by 7:00 p. m. was repeated later in the afternoon, when Buchanan again called in, and was overheard by the night supervisor. (Buchanan testified that he was not told to return by 7:00 p. m. and that the warehouse supervisor's concern was that he not bring back too many undelivered orders; also, that he

carried no unauthorized passengers on his truck.) Buchanan returned to Monarch's premises sometime after 11:00 p. m. and clocked out at 12:38 a. m. The next morning, he called in to the warehouse supervisor and was discharged. That same day, the Union's business agent telephoned the branch manager to ascertain details of Buchanan's alleged offense and asked that the discharge be reconsidered. On November 24, the business agent discussed Buchanan's discharge with the branch manager and the warehouse supervisor and asked them to reconsider it. The next day, a grievance meeting was held at which officers of the Union insisted that Buchanan's failure to return by 7:00 p. m. was the result of a misunderstanding and asked for reinstatement.[4] The warehouse supervisor took the position that Buchanan's past record, failure to report in as directed, and carrying an unauthorized passenger prevented him from reconsidering, but that an appeal could be made to the branch manager. The business agent spoke to the branch manager several times and tried to persuade him that the whole thing was a misunderstanding and that discharge was too harsh a penalty. The Union president also spoke to the branch manager and asked that something be worked out. These efforts were unsuccessful.

Throughout the efforts in Buchanan's behalf, the business agent kept him adequately informed of developments, but he did not invoke Article 21 of the collective bargaining agreement. He also obtained some money due Buchanan in connection with an unrelated grievance. In January 1976, after the Union's efforts had proved fruitless and he had told Buchanan that nothing further could be done, Buchanan asked him to take the matter to arbitration. The business agent discussed this request with the Union's president and other business agents, and Buchanan was informed on or about January 20, 1976, that they had decided not to take his case to arbitration because "there was no way the case could be won." In February 1976 the business

---

4. Buchanan testified that the business agent spoke up in his behalf at the grievance meeting.

agent referred Buchanan to another potential job, but Buchanan did not apply.

On April 26, 1976, Buchanan filed an unfair labor practice charge against the Union, alleging violation of section 8(b)(1)(A) in not properly processing his grievance. On June 14, 1976, the Regional Director of the NLRB filed a complaint against the Union on the basis of Buchanan's charge. Hearings were held on July 16 and August 10, 1976. The decision of the ALJ in favor of Buchanan was issued on December 30, 1976, to which exceptions were taken by the Union. On June 7, 1977, a three-member panel of the NLRB issued its decision, reversing the ALJ, and ordered that the complaint be dismissed.

## OPINION

Three threshold issues have been raised: (1) whether, as argued by the Union, this court lacks jurisdiction because the petition for review was filed more than sixty days after entry of the decision and order of the NLRB;[5] (2) whether, as argued by the Union and Amicus, Buchanan's petition is barred by laches; and (3) whether, as found by the NLRB and now argued by the GCNLRB, and as also argued by the Union and Amicus, the two-week notice provision (which is a condition precedent to arbitration) in Article 21 of the collective bargaining agreement had "atrophied" by mutual consent of the parties.[6]

### (1) Jurisdictional issue

[1] With respect to the jurisdictional issue, the Union argues that the sixty-day limitation period in 28 U.S.C. § 2107[7] applies to Buchanan's petition. However, as pointed out by Amicus, the National Labor Relations Act (codified as ch. 7 of Title 29)

does not prescribe a time within which a petition for review or enforcement of an NLRB order must be filed; and Rule 15(a) of the Federal Rules of Appellate Procedure merely provides that a party seeking review of an order of an administrative agency must file a petition for review "within the time prescribed by law." The Union maintains that this case involves a proceeding with respect to an agency of the United States, which brings it within the scope of section 2107. It reasons that sections 2101 through 2112 constitute a "statutory scheme" enacted by Congress for review of district court and governmental agency matters; that section 2112 provides for the manner of filing (and contents of) a certified copy of the record of proceedings (before an agency, board, or commission) with a court of appeals; and that, by thus providing for one element of procedure, which would cover petitions from the NLRB, it is "reasonable to assume" that the Congress intended that the sixty-day limitation period in section 2107 also apply in the case of petitions from the NLRB. However, the "statutory scheme" theory fails upon consideration of section 10(f) of the National Labor Relations Act (29 U.S.C. § 160(f)), which refers to 28 U.S.C. § 2112 in the matter of filing the record in an appeal, but *does not refer to 28 U.S.C. § 2107 regarding the time for filing.* This is a clear signal that Congress intended a "no time limit" under the National Labor Relations Act for petitions to courts of appeals. *See Griffith Co. v. NLRB,* 545 F.2d 1194 (9th Cir. 1976); *Kovach v. NLRB,* 229 F.2d 138 (7th Cir. 1956).

### (2) Laches issue

■ In both *Kovach* and *Griffith, supra,* the subject of laches was discussed. In

---

5. The NLRB's decision and order were entered on June 7, 1977. Buchanan's petition to this court was filed on April 13, 1978, pursuant to section 10(f) of the National Labor Relations Act (29 U.S.C. § 160(f)), which permits "[a]ny person aggrieved by a final order of the Board" to petition an appropriate court of appeals for review of the order.

6. We note that the GCNLRB has not raised threshold issues (1) and (2).

7. Section 2107 ("Time for appeal to court of appeals") provides in pertinent part:

In any action, suit or proceeding in which the United States or an officer or agent thereof is a party, the time as to all parties [for appeal to a court of appeals from any judgment, order or decree entered in a civil action] shall be sixty days from such entry.

*Kovach, supra* at 141, the court said that the passage of time "must cause or be accompanied by a change in position which would make it unfair to enforce rights that have been allowed to lie dormant," and that—

> Each case should be viewed independently in the light of all its surrounding facts. The party raising the issue of timeliness should not only show that more time has elapsed than was reasonably necessary in the particular situation, but he should also show that during that time his opponent has gained some advantage he did not originally have or that he himself has been prejudiced by the delay in bringing the action.

In that case, the period of time between entry of the NLRB's order and the filing of the petition for review was nearly six months, while in *Griffith* the period was seventy-nine days. In neither case was the doctrine of laches invoked. Here the period was ten months and six days. We are inclined to agree with the Union and Amicus that this period was more than reasonably necessary,[8] but we are not persuaded that the delay resulted in petitioner gaining an advantage or the Union or Amicus being prejudiced—insofar as litigating the main issue of fair representation is concerned. While undue delay might appear to pose a threat of increased liability to the Union and Amicus, such delay would be a consideration in mitigation of any damages that might be awarded.

### (3) "Atrophy" of two-week notice provision in Article 21

In support of its finding that the two-week notice provision (which was a condition precedent to arbitration) in Article 21 of the collective bargaining agreement had "atrophied" by mutual consent of the parties, the NLRB relied on testimony of the business agent that since he began representing the employees at Monarch in 1967 there had been no application of the two-week notice provision; also, on testimony of the warehouse supervisor that he knew of no application of the provision during the eight to ten years he had been warehouse supervisor;[9] and further, on "previous discharges" at Monarch, in which the provision had not been observed. However, as the ALJ found, the record shows only four discharges allegedly supporting the "atrophy" argument: two for dishonesty or intoxication, neither of which would trigger the two-week notice provision; one who had an excessive accident rate and never "sought to grieve the discharge"; and one who was discharged for aggravated absenteeism and never protested it. These can hardly be classified as significant occasions for invoking the two-week notice provision, much less as examples of waiver of the provision by the Union and affected employees. The testimony of the business agent and the warehouse supervisor failed to show that there had been any significant occasions for invoking the provision, and the naked fact that it had not been invoked

**8.** In *NLRB v. Pool Mfg. Co.*, 339 U.S. 577, 70 S.Ct. 830, 94 L.Ed. 1077 (1950), an interval of two-and-a-half years was deemed not unreasonable where the NLRB petitioned for enforcement of its order. However, in *NLRB v. Norfolk Shipbuilding & Drydock Corp.*, 172 F.2d 813, 816 (4th Cir. 1949), this court indicated that an interval of over two years in filing a petition for enforcement "might well be sufficient ground for denying enforcement" unless no substantial harm resulted from the delay. Amicus cites this court's statement in the maritime case of *Giddens v. Isbrandtsen Co.*, 355 F.2d 125 (4th Cir. 1966), that prejudice may be inferred where the period of delay exceeds that of an analogous statutory limitation. Amicus suggests that section 2107, with its sixty-day period, is analogous to the instant proceeding. However, we do not agree that section 2107 is analogous to the "no time limit" found in the National Labor Relations Act. Also, we note that this court, in *Giddens v. Isbrandtsen, supra* at 127–28 confined its statement to personal injury actions and specifically excluded "other spheres of maritime litigation, such as suits involving contracts."

**9.** The business agent also testified that the two-week notice provision was in all wholesale grocery contracts and that he did not know of any other application of the provision; that he had worked under such contracts since 1952. However, there is no evidence that, prior to becoming business agent at Monarch in 1967, he had been in a position to be informed whether there had been application of the provision.

cannot support a finding that there was a "pattern of nonutilization" resulting in "atrophy." Accordingly, we conclude that there is no substantial evidence supporting the NLRB's finding that the two-week notice provision had "atrophied." [10] Congressional policy encourages the use of arbitration in the settlement of labor-management disputes, and doubts, if any, should be resolved in favor of coverage of an arbitration provision. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–1353, 4 L.Ed.2d 1409 (1960).

### (4) Fair representation issue

The question here is whether, notwithstanding the Union's failure to invoke the two-week notice provision and proceed to arbitration under Article 21 of the collective bargaining agreement, the NLRB correctly ruled that the Union satisfied its duty to Buchanan of fair representation for purposes of section 8(b)(1)(A) of the National Labor Relations Act.[11]

■ The Supreme Court in *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967), has affirmed the principle that the statute imposes upon unions the duty "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." [12] The duty to

avoid arbitrary conduct does not require a union to take every employee grievance to arbitration, and it has considerable discretion [13] in sifting out grievances which it regards as lacking merit. Without such discretion, a union's effectiveness as bargaining agent would be undermined. *Vaca v. Sipes, supra* at 191–92, 87 S.Ct. at 917; *Hardee v. N.C. Allstate Services, Inc.*, 537 F.2d 1255, 1259 (4th Cir. 1976). That a grievance was meritorious or that the union was negligent in not taking the grievance to arbitration does not, *per se*, constitute a showing that the union engaged in arbitrary conduct. *Vaca v. Sipes, supra*, 386 U.S. at 191–95, 87 S.Ct. at 917–19; *Griffin v. International Union, United Automobile, Aerospace & Agricultural Implement Workers*, 469 F.2d 181, 183 (4th Cir. 1972); *Bazarte v. United Transportation Union*, 429 F.2d 868, 872 (3d Cir. 1970).

■ In view of the Union's efforts on Buchanan's behalf, both before and after his discharge, which have been related earlier in this opinion, we are satisfied that substantial evidence supports a conclusion that the Union handled Buchanan's grievance in good faith and without hostility or discrimination.

In arguing that the Union was arbitrary in failing to demand his immediate reinstatement pending arbitration under Article 21, Buchanan declares that no excuse for

---

**10.** Petitioner argues that the statement about "theft" in the letter of discharge from Monarch's warehouse manager (note 2, *supra*) shows that Monarch was trying to avoid the two-week notice provision in Article 21 of the collective bargaining agreement, thus recognizing that the provision had not atrophied. The GCNLRB disputes such an interpretation. However, in view of the conclusion just stated, we need not resolve this dispute.

**11.** Section 8(b)(1)(A) provides:
   (b) It shall be an unfair labor practice for a labor organization or its agents—
   (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . . .

Section 157 provides, *inter alia*, that employees shall have the right "to bargain collectively through representatives of their own choosing."

**12.** In its opinion, the NLRB noted that there was "no contention of bad faith or hostility toward Buchanan" and that the "key question" is whether the Union engaged in "arbitrary conduct."

**13.** In *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), the Supreme Court declared:
   A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

such failure appears. We do not agree. As the GCNLRB points out, Monarch officials regarded Buchanan as a consistently inefficient employee who accumulated excessive overtime; he was the subject of numerous complaints; he was twice instructed on November 19, 1975, to report in by 7:00 p. m. and did not do so until after 11:00 p. m., clocking out at 12:38 a. m.; and there was a report to the warehouse supervisor by a disinterested Monarch salesman indicating that Buchanan had an unauthorized passenger on his truck. If the Union had demanded Buchanan's reinstatement before undertaking negotiations, it would have meant saddling Monarch, for two more weeks, with an employee whom Monarch's management strongly regarded as undesirable—a step that reasonably could have been considered detrimental to the maintenance of good relations between the Union and the employees in the collective bargaining unit, on the one hand, and Monarch, on the other hand. Moreover, since informal negotiations and a grievance meeting had been unsuccessful, we are satisfied that the Union was justified in deciding that there would be no chance of winning in an arbitration proceeding even if Buchanan were reinstated. *See NLRB v. Finesilver Manufacturing Co.*, 400 F.2d 644 (5th Cir. 1968); *NLRB v. Barberton Plastics Products, Inc.*, 354 F.2d 66 (6th Cir. 1965); *Martel Mills Corp. v. NLRB*, 114 F.2d 624 (4th Cir. 1940).

Finally, Buchanan argues that the Union "had a contractual right to demand reinstatement pending arbitration" and that its failure to enforce this right on his behalf without any reason was "so arbitrary as to constitute a violation of the duty of fair representation." However, collective bargaining agreements are not ordinary contracts. *NLRB v. Cone Mills Corp.*, 373 F.2d 595, 598 (4th Cir. 1967). They are unique in character and a field unto themselves. *United Packinghouse Workers of America v. Maurer-Neuer, Inc.*, 272 F.2d 647, 649 (10th Cir. 1959), *cert. denied*, 362 U.S. 904, 80 S.Ct. 611, 4 L.Ed.2d 555 (1960). A union, as custodian of the collective bargaining process in behalf of *all* employees, must be permitted a "wide range of reasonableness . . . in serving the unit it represents." *Ford Motor Co. v. Huffman, supra.* Considering the circumstances of Buchanan's case, it is our conclusion that the Union, which had to take into account its responsibility to look out for the best interests of the collective bargaining unit, did not act arbitrarily in declining to press for enforcement of the two-week notice and reinstatement provision. *Bazarte v. United Transportation Union, supra.*

Accordingly, we hold that the NLRB correctly ruled that the Union satisfied its duty to Buchanan of fair representation for purposes of section 8(b)(1)(A) of the National Labor Relations Act.

The decision and order of the NLRB are *affirmed*.

AFFIRMED.