**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS' UNION LOCAL 531, Respondent.**

No. 78–3717.

United States Court of Appeals, Ninth Circuit.

June 2, 1980.

---

Andrew F. Tranovich, Washington, D. C., for petitioner.

Lionel Richman, Richman & Garrett, Los Angeles, Cal., for respondent.

Before GOODWIN, WALLACE and SKOPIL, Circuit Judges.

WALLACE, Circuit Judge:

The National Labor Relations Board (Board), pursuant to section 10(e) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(e), petitions this court for enforcement of its order that the Hotel and Restaurant Employees and Bartenders' Union, Local 531 (Union) cease and desist from certain unfair labor practices under sections 8(e) and 8(b)(4)(ii)(A) and (B) of the NLRA. We enforce the order.

### I.

Angelus Auto Parks, Inc. and Elnic Corporation, d/b/a Verdugo Hills Bowl (Bowl), operate a bowling alley in Los Angeles, California. The Bowl belongs to a multi-employer bargaining group known as the Bowling Proprietors Association (Association), the membership of which consists of various bowling alley proprietors in the Los Angeles area. Effective November 1, 1976, the Association entered a collective bargaining agreement with the Union, binding upon the Bowl by virtue of its membership in the Association. The agreement contained a provision, article 2B, which is the focal point of this litigation:

> In the event that the Employer leases out or sub-Contracts out any operation or part of any operation which is covered by this Agreement, and the lessee or subcontractor utilizes the services of employees performing work covered by this Agreement, then this Agreement shall be applicable to and binding upon said lessees or subcontractors; provided further, that in the event the lessee or subcontractor fails to comply with any provisions of this Agreement or fails to make any payment set forth herein . . . then the Employer shall remain liable for such failure and shall be obligated to make such payments.

The agreement also contained a union-security clause, a provision requiring employers to recognize the Union as the exclusive bargaining representative of their employees, and provisions requiring employer contribution to health and retirement funds.

Prior to commencement of the agreement, the Bowl employed 11 members of the Union in a coffee shop that it operated on the premises. In May 1976, the Bowl leased the coffee shop to Goodrich. During the six months that he operated the coffee shop, Goodrich avoided conflict with article 2B by voluntarily entering a Union contract covering the 11 coffee shop employees.

Following termination of the Goodrich lease, the Bowl leased the coffee shop to Eng for six and one-half months with two successive five-year options to renew. The lease required that Eng pay the Bowl six percent of gross sales per month as rent for the premises, sell drinks at a price equal to or greater than the price charged by a bar on the premises, and repair at his cost all equipment that could not be repaired by the Bowl's mechanic. Shortly after Eng commenced operation of the coffee shop, Union Agent Knuckles asserted that article 2B required that Eng abide by all terms of the collective bargaining agreement and that the Bowl should cease doing business with Eng if he refused to comply. When Eng refused and the Bowl did not cease doing business with him, Knuckles threatened that the Union would strike the Bowl if Eng did not sign a collective bargaining agreement. No strike was called and in May 1977 the Union instituted a civil suit in California state court seeking injunctive relief and enforcement of the agreement between the Bowl and the Union. Eng's lease expired in September 1977 and he vacated the premises.

The Bowl next leased the coffee shop to Lewis and Jeanne Neider for a five-year term beginning October 1, 1977. The lease stated: "[a]s a condition of this Lease, Lessee agrees that all of his employees shall be members of the local Culinary Union." The Neiders initially hired four Union members previously employed by Eng and later hired two additional non-Union employees. Shortly thereafter the Bowl served notice of eviction on the Neiders for failure to enter a collective bargaining agreement with the Union and for failure to remain open during specified hours. The Bowl subsequently initiated an unlawful detainer action against the Neiders.

As a result of article 2B and the Union's effort to force compliance with it, the Board charged, and subsequently concluded, that article 2B violated NLRA § 8(e), 29 U.S.C. § 158(e), and that Union threats to strike violated NLRA § 8(b)(4)(ii)(A) and (B), 29 U.S.C. § 158(b)(4)(ii)(A), (B). 237 N.L.R.B. No. 190 (1978). The section 8(e) violation was based upon the Board's finding that article 2B had an effect "identical to that of the typical [and unlawful] 'union signatory clause.' " Section 8(b)(4)(ii)(A) was violated by the Union threat to strike in maintenance of article 2B and section 8(b)(4)(ii)(B) was violated because the Union strike threat was designed to cause the Bowl to cease doing business with Eng. The Board ordered that the Union cease and desist from these unfair labor practices and post corrective notices.[1]

Although the Union concedes that its strike threat violated section 8(b)(4)(ii)(B), it advances two arguments to counter the Board's finding that article 2B is an illegal contract provision under the NLRA. First, the Union argues that article 2B does not violate NLRA § 8(e) because it is not a contract or agreement to "cease doing business with any other person" within the meaning of section 8(e). Specifically, the Union contends that the Bowl's lease is a capital divestment tantamount to a sale of assets such that the Bowl is not "doing business" with its lessee. Second, the Union argues that even if the Bowl is doing business with its lessee, article 2B is a valid work preservation clause. In making these arguments, the Union relies upon *Howard Johnson Co. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), contending that the Supreme Court there implicitly approved conduct such as that of the Union in this case. After discussing the scope of section 8(e), we shall give separate consideration to each

of these contentions, including the Union's reliance on *Howard Johnson*. Because the portion of 8(b)(4)(ii)(A) allegedly violated by the Union expressly requires the existence of an agreement prohibited by section 8(e), this opinion focuses only upon the existence of a section 8(e) violation.

### II.

NLRA § 8(e) provides in part:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void . . . .

29 U.S.C. § 158(e). Section 8(e) aims at contractual provisions. It prohibits only those provisions establishing secondary union pressures. *National Woodwork Mfrs. Assoc. v. NLRB*, 386 U.S. 612, 633–35, 87 S.Ct. 1250, 1262–63, 18 L.Ed.2d 357 (1967); *Griffith Co. v. NLRB*, 545 F.2d 1194, 1198 (9th Cir. 1976), *cert. denied, Waggoner v. Griffith Co.*, 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 125 (1977); *Associated Gen. Contractors, Inc. v. NLRB*, 514 F.2d 433, 437 (9th Cir. 1975); *NLRB v. Joint Council of Teamsters No. 38*, 338 F.2d 23, 28 (9th Cir. 1964). Union pressure is secondary when it is brought to bear upon a neutral or secondary employer for the purpose of forcing that neutral or secondary employer to apply pressure to the primary employer with whom the union has a labor dispute. The tactical objective of secondary pressure is not to influence the labor policy of the neutral employer against whom it is direct-

---

1. Section 8(b)(4)(ii)(A) prohibits force designed to cause a person "to *enter into* any agreement which is prohibited by subsection (e)," 29 U.S.C. § 158(b)(4)(ii)(A) (emphasis added), and section 8(e) makes it unlawful "*to enter into* " a contract creating secondary pressures, 29

U.S.C. § 158(e) (emphasis added). As the Board explained in the decision below, the maintenance, enforcement, and reaffirmation of such agreements constitutes "entering into" within the meaning of these provisions. 237 N.L.R.B. No. 190, slip op. at 8 (Aug. 28, 1978).

ed, but to influence the labor policy of the primary employer. *See National Woodwork Mfrs. Assoc. v. NLRB, supra,* 386 U.S. at 619–33, 87 S.Ct. at 1254–62. Therefore, section 8(e) prohibits employers and unions from entering into contracts designed to involve neutral employers in labor disputes not their own. Contractual provisions designed to create primary pressure—pressure brought to bear directly upon the primary employer with whom the union has a quarrel—are not prohibited by section 8(e). *Id.* at 635, 87 S.Ct. at 1263; *Griffith Co. v. NLRB, supra,* 545 F.2d at 1198.

### III.

As mentioned earlier, the Union contends that article 2B cannot be violative of section 8(e) because the Bowl is not "doing business" with its lessees within the meaning of that provision. The Union relies upon two Board decisions, *Operating Engineers, Local 701 (Cascade Employers),* 221 N.L.R.B. 751 (1975), and *District No. 71, IAMAW (Harris Truck),* 224 N.L.R.B. 100 (1976), which held that an outright sale of assets cannot create a doing business relationship cognizable under section 8(e). The Union contends that Bowl's lease was essentially a disposition of capital and that the Board erred in relying upon the fact that this was a lease, not a sale.

■ We agree with the Union that the title of a transaction should not determine the applicability of section 8(e) and that a clear articulation of the doing business requirement is needed. We do not agree, however, that the Board relied solely upon the title of the Bowl's transaction in distinguishing *Cascade Employers* and *Harris Truck.* Rather, the Board appropriately examined the underlying nature of the transaction, concluding that "here the lease is not comparable to a sale, for no permanent transfer took place where one entity was substituted for another. Rather, the Bowl retained an interest in the property and placed conditions upon its use in the terms of the lease." The doing business requirement of section 8(e) can only be met when the parties occupy a business relationship susceptible to the secondary pressures prohibited by section 8(e). As the Third Circuit recently stated: "The phrase 'doing business' refers to a continuing business relationship which is capable of being discontinued by one employer in order to force another employer to accede to union demands." *Amax Coal Co. v. NLRB,* 614 F.2d 872, 885 (3rd Cir. 1980). In the absence of such a relationship, section 8(e) has no application because secondary pressure is not possible.

■ Applying this articulation of the doing business requirement to the facts before us, we agree with the Board's conclusion that the Bowl is doing business within the meaning of section 8(e). The continuing business relationship between the Bowl and its lessee is that of landlord and tenant. The coffee shop and bowling alley, situated on the same premises, cater to each other's clientele with the success of one enterprise undoubtedly impacting upon the success of the other. Indeed, the Bowl's receipt of rent is entirely dependent upon the coffee shop's success which in turn depends primarily on the Bowl's ability to attract customers. As owner of the property, the Bowl has placed certain time and use restrictions upon the lessees and may enforce those restrictions by threat of eviction. At the same time, the lessees occupy property owned by the Bowl and are entitled to call upon the Bowl for equipment repairs. Thus, the Bowl and its lessees are dependent business associates. There is little doubt that the Bowl, armed with article 2B, is capable of threatening termination of the relationship in order to force its lessee to accede to Union demands. Article 2B implicitly acknowledges this coercive capability by making the Bowl liable for the failure of lessees to comply with the collective bargaining agreement. We conclude that the Board's examination of this relationship was correct when it concluded that the parties are doing business within the meaning of section 8(e).

Moreover, *Cascade Employers* and *Harris Truck* are clearly distinguishable. *Cascade Employers* involved a situation "where an

entire business entity may be transferred from one person to another." *Cascade Employers, supra*, 221 N.L.R.B. at 752. *Harris Truck* considered an actual sale of all real and personal assets of a car and truck dealership to a corporation totally separate from the selling enterprise. In *Harris Truck* the Board observed that the selling corporation "gave up . . . its franchise to represent major manufacturers of trucking equipment and trailers," and "gave up its right to do business in the future as it had in the past." *Harris Truck, supra*, 224 N.L.R.B. at 103. Further, the Board emphasized that after the transaction the seller and purchaser "operated as separate entities" and had no interchange of employees. *Id.* Thus, *Cascade Employers* and *Harris Truck*, unlike the facts before us, considered transactions that left the party employers with no means of applying pressure to each other. The employers were not doing business within the meaning of section 8(e) because a union could exercise no leverage over one employer by applying secondary pressure to the other. These cases are inapplicable to the strong business relationship evidenced by the facts before us in this case.

### IV.

The Union argues that article 2B does not violate section 8(e) because it produces no impermissible secondary pressures. Rather, the Union contends, the clause acts to preserve the work of Bowl employees and thus promotes a valid primary purpose.

Work preservation clauses, also known as union standards clauses, prohibit an employer from subcontracting work normally performed by union employees to any employer who pays his employees less than union wages. By prohibiting such employer conduct, these clauses "remove from the employer the temptation of [hiring] cheap labor through substandard contractors." *Meat and Highway Drivers, Local 710 v. NLRB*, 335 F.2d 709, 716 (D.C.Cir.1964). Because the pressure produced by such clauses is focused upon the primary employer with whom the union is concerned, is tactically calculated to cause that primary employer to preserve traditional union work, and benefits mainly the employees of that employer, the pressure is primary and protected. *See Griffith Co. v. NLRB, supra*, 545 F.2d at 1200. Thus, courts have widely held that work preservation or union standards clauses are not prohibited by section 8(e). *National Woodwork Mfrs. Assoc. v. NLRB, supra*, 386 U.S. at 634–35, 87 S.Ct. at 1262–63; *Griffith Co. v. NLRB, supra*, 545 F.2d at 1202 n.13; *Associated Gen. Contractors, Inc. v. NLRB, supra*, 514 F.2d at 438; *NLRB v. National Maritime Union*, 486 F.2d 907, 912 (2d Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974); *Meat and Highway Drivers, Local No. 710 v. NLRB, supra*, 335 F.2d at 713.

Work preservation clauses are generally characterized by the fact that they define the group of permissible subcontractors in terms of economic standards rather than terms of union affiliation. Another variety of clause, generally known as a union signatory clause, focuses on union affiliation by prohibiting an employer from subcontracting work to any employer not signatory to or approved by the union. Union affiliation or approval bears no absolute relationship to the economic condition of a subcontractor, and clauses requiring such affiliation or approval are directed at more than work preservation—they are generally viewed as an effort to expand the union's sphere of influence by impermissible secondary pressure. Thus, it is well settled that union signatory clauses violate section 8(e). *Amax Coal Co. v. NLRB, supra*, 614 F.2d at 888; *NLRB v. National Maritime Union, supra*, 486 F.2d at 912; *NLRB v. Joint Council of Teamsters 38, supra*, 338 F.2d at 28; *Truck Drivers Union Local 413 v. NLRB*, 334 F.2d 539, 548 (D.C.Cir.1964).

Article 2B does not simply require that the Bowl lease the premises to lessees who observe the economic standards set by the Union, it requires that all provisions of the collective bargaining agreement "be applicable to and binding upon said lessee . . . .." In other words, the Bowl may not lease the coffee shop to any individuals

who will not recognize and become bound by the collective bargaining agreement. Article 3A of the agreement requires that any employer bound thereby "recognize[ ] the Union as the exclusive bargaining agent for all of its employees . . .." Thus, a condition precedent for lease of the coffee shop to any employer is, effectively, that such employer agree to recognize and contract with the Union, the precise effect of union signatory clauses. Moreover, that article 2B will involve the Bowl in labor disputes between its lessee and the Union is amply demonstrated by the fact that the Bowl becomes liable "in the event the lessee or subcontractor fails to comply with any provisions of this Agreement." We have no doubt that the tactical objective of article 2B is the unionization of the Bowl's lessees rather than the labor policy of the Bowl itself. That some benefit may flow to the Bowl's employees is not sufficient to alter the basically secondary nature of the provision. We hold, therefore, that the creation of article 2B and its attempted enforcement through threat of strike violated section 8(e) and section 8(b)(4)(ii)(A) of the NLRA.

### V.

 In *Howard Johnson Co. v. Local Joint Executive Board, supra,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46, the Supreme Court held that the purchaser of a business is not bound by the collective bargaining agreement of its predecessor. This was so even though the predecessor's collective bargaining agreement contained a provision making the agreement binding upon any purchasers of the business. In a footnote, the Court stated: "The union apparently did not explore another remedy which might have been available to it prior to sale, *i. e.,* moving to enjoin the sale to Howard Johnson on the ground that this was a breach . . . of the successorship clauses in the collective-bargaining agreements." *Id.* at 258 n.3, 94 S.Ct. at 2240 n.3. Counsel for the Union in this case argued vigorously that this statement implicitly approves the conduct undertaken in this case: creation of article 2B and the filing of a civil suit to enforce it. We disagree. *How-*

*ard Johnson* contained no unfair labor practice analysis. It strains reason to say that a case which held that a successor employer need not arbitrate under the provisions of his predecessor's collective bargaining agreement stands for the proposition that a provision in that collective bargaining agreement did not violate section 8(e). The Court in *Howard Johnson* simply did not consider that question and the case cannot be used as authority for that proposition.

ORDER ENFORCED.