# United States Court of Appeals
## For the First Circuit

No. 11-1818

NATIONAL LABOR RELATIONS BOARD,

Petitioner, Cross-Respondent,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 251,

Respondent, Cross-Petitioner.

ON APPLICATION FOR ENFORCEMENT AND CROSS-PETITION FOR REVIEW
OF A FINAL ORDER OF THE NATIONAL LABOR RELATIONS BOARD

Before

Lynch, Chief Judge,
Souter,* Associate Justice,
and Lipez, Circuit Judge.

David A. Seid, with whom Ruth E. Burdick was on brief, for
petitioner.
Marc B. Gursky, with whom Elizabeth Wiens and Gursky Law
Associates were on brief, for respondent.
Thomas J. McAndrew, with whom Thomas J. McAndrew & Associates
were on brief, for intervenor J.H. Lynch & Sons, Inc.

August 14, 2012

* The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**LIPEZ**, **Circuit Judge**.  This case is before us upon an application for enforcement, and a cross-petition for review, of an order of the National Labor Relations Board ("NLRB" or the "Board").  Although the dispute between the parties has involved many issues, there is one central issue in this appeal -- whether a May 28, 1999 letter of agreement (the "May 1999 agreement") between the International Brotherhood of Teamsters, Local 251 ("Local 251" or the "union") and J.H. Lynch & Co. ("Lynch") violated section 8(e) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(e), by impermissibly preventing Lynch from doing business with two third-party subcontractors.  The Administrative Law Judge ("ALJ") who originally heard the case found that the agreement did not violate section 8(e) with respect to one subcontractor, but did with respect to the other.  Upon review, the NLRB, emphasizing the plain terms of the May 1999 agreement, found that the agreement's application to both subcontractors violated section 8(e) of the Act and entered a remedial order.

The Board now applies for enforcement of its order.  In turn, Local 251 petitions for limited review of the NLRB's decision, arguing that the NLRB erred in reversing the ALJ and that, because more than 10 years passed between the events in question and the NLRB's decision, it would be inappropriate to enforce the decision.

We conclude that the NLRB erred in finding that the May 1999 agreement violated section 8(e) of the Act with respect to one of the subcontractors. In light of contradictory evidence in the record that the Board failed to consider, the plain text of the May 1999 agreement is not substantial evidence supporting the Board's conclusion that the agreement had an impermissible intent. Rather, as the ALJ found, the evidence in the record indicates that the agreement was intended to preserve union jobs at Lynch, a lawful purpose under the Act. Therefore, we reverse the Board's finding with respect to this aspect of the May 1999 agreement. However, the union does not challenge the Board's finding as it relates to the other subcontractor, and thus the Board is entitled to enforcement of that aspect of its order. Accordingly, we grant the Board's application for enforcement only as to the agreement's prohibition on Lynch's use of that second subcontractor.

## I.

### A. The Dispute

Lynch is a highway construction general contractor with facilities in Rhode Island, and a signatory of the Construction Industries of Rhode Island's ("CIRI") collective bargaining agreement with Local 251. CIRI is an association representing construction industry employers in Rhode Island. As of 2000, there were approximately 100 Rhode Island employers who had joined the CIRI collective bargaining agreement with Local 251 and were thus

bound by its terms. Local 251 is the Teamsters local union with jurisdiction over Rhode Island and portions of Massachusetts. Local 251 is the longtime representative of truck drivers employed by Lynch, although the number of members in Local 251's bargaining unit at Lynch has been steadily declining. Lynch employed 26 Local 251 members in 1995, 16 in 1997, and only 10 in 2001. According to Local 251's vice president and business agent, Joseph Boyajian, this decline is part of a concerted effort on the part of Lynch to replace its unionized drivers with non-union subcontractors. Before the ALJ, he testified that, each time a truck driver retired, Lynch would sell a truck and replace that person with a subcontractor, gradually reducing the number of bargaining unit employees.

Lynch acknowledged that hiring subcontractor drivers was a common practice, noting that during particularly busy times it would hire as many as 30 to 40 additional trucks each day. These additional drivers were employed by several different subcontractors, many of which were non-union employers. Boyajian was especially troubled by Lynch's use of two subcontractors, Northeast Transportation, Inc. ("Northeast") and Cullion Excavating Corp. ("Cullion"), because these two subcontractors did not pay the prevailing rate to their drivers.[1] The collective bargaining

---

[1] The prevailing rate is the rate of compensation, including wages and benefits, established by the terms of the collective bargaining agreement. An agreement requiring the employer to pay

-4-

agreement ("CBA") between Local 251 and CIRI provides that employers are not permitted to use subcontractors unless employees of the subcontractors are paid the prevailing rate. Over the course of several years, Boyajian complained to Lynch about its use of subcontractors, especially Northeast, that did not pay the prevailing rate. Finally, in May 1999, Local 251 filed grievances with the NLRB complaining that the use of subcontractors who failed to pay the prevailing rate was a violation of the union's CBA with CIRI.[2]

After these grievances were filed, Boyajian met with David Lynch, the president of Lynch, and Billy Cabral, Lynch's controller, to discuss the issue. At the meeting, Lynch promised not to use Northeast or Cullion, and he subsequently sent a May 28, 1999 letter to Boyajian memorializing the agreement between the parties. In relevant part, this letter states:

> The trucking services of Northeast Transportation Corp. and Cullion Excavating Corp. will not be utilized. Should a particular project come along that requires

any subcontractors the prevailing rate (also known as a "union standards" clause) removes the economic incentive for an employer to subcontract work done by union members.

[2] The version of the CBA included in the record is that which was in effect from May 1, 2000, to April 30, 2003. This version contains a provision requiring that any subcontracting done by CIRI signatories comply with the terms of the CBA, including the wages, hours and working conditions established by the CBA. Although the parties did not provide the CBA that was in effect in May 1999, Local 251 asserts that it had a similar provision, and Lynch does not dispute this fact.

-5-

excessive trucking and we are not able to supplement our fleet adequately, we will notify you of the situation to allow us to amicably resolve the problem. The Employer acknowledges the Union's right to strike to enforce this Agreement.

This agreement is the primary subject of the dispute between the parties at this stage.

In April 2001, Boyajian learned that Lynch was again using Northeast for trucking services, even though Northeast drivers still were not being paid the prevailing rate. After Lynch indicated that it intended to continue to use Northeast, Local 251 members went on strike on April 16, 2001, at Lynch locations in Cumberland and East Providence. Lynch sought a temporary restraining order enjoining the strike, which was eventually resolved by the union's agreement to end the strike on April 23, 2001. In a separate lawsuit, Lynch sought money damages against Local 251 for what it alleged to be an illegal strike.[3]

## B.  The ALJ's Decision

Immediately following the strike, Lynch filed several charges against Local 251 with the NLRB alleging violations of section 8(b)(4)(ii)(A) & (B) and 8(e) of the Act.[4]  These charges

---

[3] The suit seeking damages, J.H. Lynch & Sons v. Int'l Bhd. of Teamsters, Local 251, No. 01-193 (D.R.I. filed Apr. 20, 2001), is currently in abeyance awaiting resolution of this appeal.

[4] Generally, section 8(e) makes it unlawful for any labor organization and employer "to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from . . . doing business with any other

-6-

were consolidated with those filed by another employer and the case referred to an administrative law judge. With regard to the charges brought by Lynch, the major issue was whether the parties' May 1999 agreement violated section 8(e) of the Act by impermissibly preventing Lynch from doing business with a third party. As described in greater detail below, such an agreement is valid if its objective is the preservation of work for bargaining unit employees -- such an agreement involves primary activity. In contrast, if the purpose of the agreement is to further union objectives with respect to a third party (e.g., pressuring the third party to accept unionization of its employees), it involves secondary activity and violates section 8(e). Thus, the focus of the ALJ was an inquiry into Local 251's motives in entering into the May 1999 agreement.

After eight days of hearings, held between August and December of 2001, the ALJ issued his decision on April 25, 2002. He found that the May 1999 agreement, memorialized by Lynch's May 28, 1999 letter, violated section 8(e) of the Act with regard to Cullion, but not Northeast. The written decision explains that "the May 1999 agreement is secondary activity with regards to Cullion because the Union has not established that Cullion was

person." 29 U.S.C. § 158(e). Relatedly, section 8(b)(4)(ii)(A) & (B) make it an unfair labor practice for a union to seek to coerce an employer into an agreement that would violate section 8(e) or coerce a third-party employer into recognizing the union. Id. § 158(b)(4)(ii)(A) & (B)

-7-

performing work traditionally performed by Lynch's bargaining unit employees."  In contrast, the ALJ found that the Northeast drivers hired by Lynch were doing bargaining unit work.  Therefore,

> the . . . agreement and the Union's efforts to enforce it with regard to Northeast in April 2001, were valid efforts at 'work preservation' . . . .  [Accordingly, the] dispute with Lynch over the use of Northeast trucks [is] a primary dispute and therefore I find that the parties' May 1999 agreement with regard to Northeast did not violate Section 8(e).  Similarly, I find that the Union's efforts to enforce this agreement in April 2001 did not violate Section 8(b)(4).

## C.  The NLRB's Decision

The NLRB reversed the ALJ's decision with respect to Northeast.  While it applied the same legal standard, and stated that it did not intend to disturb the ALJ's findings of fact, the NLRB found that "the May 1999 agreement [between Local 251 and Lynch] violated Section 8(e) on its face without regard to whether the work covered by the agreement was work traditionally performed by employees in the unit."

In reaching this conclusion, the NLRB focused on the fact that the May 1999 agreement singled out two companies, Northeast and Cullion.  It acknowledged that "an agreement that permits an employer to subcontract bargaining unit work only to subcontractors that honor the economic terms of the collective-bargaining agreement serves a lawful primary purpose -- eliminating any economic incentive to take work away from employees in the unit."

However, it found that the May 1999 agreement was more akin to a union signatory clause, which forbids an employer from subcontracting work to any person not party to an agreement with the union. Focusing on the text of the agreement, the NLRB concluded that it was intended to achieve union objectives with respect to Northeast and Cullion and was not aimed at work preservation at Lynch. Accordingly, it found that the agreement violated section 8(e) of the Act. Because the NLRB found that the May 1999 agreement was unlawful, it also found that Local 251 violated section 8(b)(4)(ii)(A) & (B) of the Act by attempting to enforce the agreement through its April 2001 strike.

To remedy these violations, the Board's order requires Local 251 to cease and desist from seeking to enforce the May 1999 agreement and from attempting to obtain any similar agreement with other employers. Additionally, the order requires Local 251 to post a remedial notice at its office, and to distribute the notice to members, as well as send the notice to the NLRB regional director who will seek to post the notice at each of the affected companies.

With this background in mind, we turn to the legal standards governing our review of the Board's decision and order.

## II.

### A. The Substantial Evidence Standard

We are typically deferential in reviewing decisions of the NLRB. "As the Board is primarily responsible for developing and applying a coherent national labor policy, we accord its decisions considerable deference." Yesterday's Children, Inc. v. NLRB, 115 F.3d 36, 44 (1st Cir. 1997) (quoting NLRB v. Bos. Dist. Council of Carpenters, 80 F.3d 662, 665 (1st Cir. 1996)) (internal quotation marks omitted). This deference means that "[w]e may not substitute our judgment for the Board's when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). Thus, although "[w]e review the Board's conclusion[s] of law de novo," we "take the Board's findings of fact to be 'conclusive if supported by substantial evidence on the record considered as a whole.'" Posadas de P.R. Assoc., Inc. v. NLRB, 243 F.3d 87, 90 (1st Cir. 2001) (quoting NLRB v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 21 (1st Cir. 1999)) (citation omitted); see also 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.").

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Posadas de P.R., 243 F.3d at 90 (quoting Beverly Enters., 174 F.3d at 21). In considering whether a conclusion is supported by substantial evidence, "[w]e must take contradictory evidence in the record into account." Howard Johnson Co. v. NLRB, 702 F.2d 1, 2 (1st Cir. 1983) (quoting Universal Camera, 340 U.S. at 487-88). Thus, the Board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." Allentown Mack Sales and Serv., Inc. v. NLRB, 522 U.S. 359, 378 (1998).

In a case such as this, where the Board and its appointed examiner, or ALJ, reach different conclusions, the Supreme Court has instructed that "[t]he 'substantial evidence' standard is not modified in any way." Universal Camera, 340 U.S. at 496. The examiner's findings and written decision are simply part of the record that the reviewing court must consider in determining whether the Board's decision is supported by substantial evidence. Id. at 493. However, when the ALJ and Board reach different conclusions there is, necessarily, evidence in the record contradicting the Board's conclusion. This circumstance has implications for our review of the Board's decision. In Universal Camera, the Supreme Court explained that "evidence supporting a conclusion may be less substantial when an impartial, experienced

-11-

examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." Id. at 496. Putting the Supreme Court's observation into practice, we have stated that "where the board has reached a conclusion opposite of that of the ALJ, our review is slightly less deferential than it would be otherwise." Haas Elec., Inc. v. NLRB, 299 F.3d 23, 28-29 (1st Cir. 2002) (quoting C.E.K. Indus. Mech. Contractors, Inc. v. NLRB, 921 F.2d 350, 355 (1st Cir. 1990)) (internal quotation marks omitted).

## B.  Section 8(e) of the Act

As noted, section 8(e) of the Act makes it unlawful for any labor organization and employer "to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from . . . doing business with any other person." 29 U.S.C. § 158(e). However, the Supreme Court has held that this provision of the Act is intended to reach only agreements with secondary objectives, not those with primary purposes protected by the Act. NLRB v. Int'l Longshoremen's Ass'n, 447 U.S. 490, 504 (1980). As we have previously explained,

> [t]he basic test for distinguishing between primary and secondary activity is whether the union's conduct was "addressed to the labor relations of the [employer against whom the pressure is exerted] vis-a-vis his own employees," and therefore primary, or whether the union's conduct against a neutral employer was "tactically calculated to satisfy union objectives elsewhere," and therefore secondary.

-12-

John B. Cruz Constr. Co., Inc. v. United Bhd. of Carpenters and Joiners of Am., Local 33, 907 F.2d 1228, 1230 (1st Cir. 1990) (second alteration in original) (quoting Nat'l Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 645 (1967)) (citations omitted).

The Supreme Court has observed that "[a]mong the primary purposes protected by the Act is 'the purpose of preserving for contracting employees themselves work traditionally done by them.'" Longshoremen, 447 U.S. at 504 (quoting NLRB v. Pipefitters, 429 U.S. 507, 517 (1977)). It has established a two-part test for identifying an agreement intended to serve this purpose, stating "[f]irst, it must have as its objective the preservation of work traditionally performed by employees represented by the union[, and,] [s]econd, the contracting employer must have the power to give the employees the work in question." Id.

With regard to the first element of this test, it is the intended purpose of an agreement, not its effect, that determines whether the agreement has a permissible primary object. In Longshoremen, the Court explained that "[t]he effect of work preservation agreements on the employment opportunities of employees not represented by the union, no matter how severe, is of course irrelevant to the validity of the agreement so long as the union had no forbidden secondary purpose to affect the employment relations of the neutral employer." 477 U.S. at 507 n.22 (emphasis added); see also In re Bituminous Coal Wage Agreements, 756 F.2d

284, 289 (3d Cir. 1985) ("So long as the union has no forbidden secondary purpose to affect the employment relations of an outside employer, the agreement is valid even though it adversely affects the employment opportunities of non-represented workers."). However, if an agreement is motivated by any secondary purpose, even if it be merely one purpose of many, it is in violation of section 8(e). See Local Union No. 25, Int'l Bhd. of Teamsters v. NLRB, 831 F.2d 1149, 1153 (1st Cir. 1987) ("It is not necessary that the only object of the guild's actions be a secondary one; so long as an object is to pressure a neutral employer, the violation is complete."). As to the second element of the test, the Supreme Court explained that "if the contracting employer has no power to assign the work, it is reasonable to infer that the agreement has a secondary objective, that is, to influence whoever does have such power over the work." Longshoremen, 447 U.S. at 504-05.

As a result of this framework, there is an important distinction between a "union standards" clause and a "union signatory" clause:

> Union standards clauses prohibiting employers from contracting work normally performed by its union employees to others who are paid less than union wages are widely held to be permissible under the NLRA. Union signatory clauses on the other hand, prohibiting employers from contracting work to others not signatory to the collective bargaining agreement or otherwise approved by the Union, have been held to be illegal secondary pressure that violates the NLRA.

-14-

Va. Sprinkler Co., Inc. v. Road Sprinkler Fitters Local Union No. 669, 868 F.2d 116, 121 (4th Cir. 1989) (citation omitted); see also NLRB v. Hotel and Rest. Emps. and Bartenders' Union, Local 531, 623 F.2d 61, 67 (9th Cir. 1980) (collecting cases). Union standards clauses remove the incentive for an employer to give bargaining unit work to subcontractors. Because the pressure generated by such an agreement is focused upon the primary employer, and benefits the employees of that employer, such a clause is lawful. See Hotel and Rest. Emps., 623 F.2d at 67. In contrast, "clauses requiring [union] affiliation or approval are directed at more than work preservation -- they are generally viewed as an effort to expand the union's sphere of influence by impermissible secondary pressure." Gen. Truck Drivers, Chauffeurs, Warehousemen and Helpers of Am., Local 957 v. NLRB, 934 F.2d 732, 736-37 (9th Cir. 1991) (quoting Hotel and Rest. Emps., 623 F.2d at 67).

Finally, the Court has emphasized that the question of whether an agreement is a valid attempt to preserve bargaining unit work requires consideration of all surrounding circumstances. Longshoremen, 447 U.S. at 504. Because of the holistic nature of the inquiry, the NLRB and reviewing courts must often look beyond the face of the agreement itself. The Third Circuit has explained that "it is often difficult, if not impossible, to determine from the wording of the clause the union's 'tactical object,' or 'design.' More than the document itself is generally needed for

-15-

that analysis." Bituminous Coal, 756 F.2d at 290 (citations omitted). Thus, no rigid, per se rule may be applied, and "the fact that work preservation aims are not apparent from a reading of the provisions does not establish that they are or are not present. The inability to discern this purpose from the clause itself does not make it violative of § 8(e)." Id. at 290 n.4. Rather, circumstances surrounding the agreement must be considered, and "[a]s a general proposition, [those] circumstances might include the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry." Nat'l Woodwork, 386 U.S. at 644 n.38.

## III.

### A. The May 1999 Agreement

In reversing the ALJ's decision on the May 1999 agreement, the NLRB focused exclusively on the language of the agreement, and particularly on the fact that Northeast and Cullion were identified by name in the agreement.[5] It explained that "we

_____

[5] Our analysis focuses on the agreement's prohibition against subcontracting with Northeast. Without elaboration, the ALJ found that the May 1999 agreement violated section 8(e) of the Act with respect to Cullion because the union failed to establish that Cullion subcontractors were doing bargaining unit work. The union did not take issue with this conclusion before the NLRB and does not raise the issue here. Accordingly, we consider only whether the agreement's prohibition against subcontracting to Northeast violated the Act. Furthermore, Northeast is the more significant of the two subcontractors identified in the May 1999 agreement. Boyajian testified that, after the May 1999 agreement, Lynch ceased

-16-

find that the May 1999 agreement violated section 8(e) on its face without regard to whether the work covered by the agreement was work traditionally performed by employees in the bargaining unit." Thus, the NLRB concluded that the agreement violated section 8(e) regardless of the circumstances surrounding the negotiation of the agreement and whether the agreement was actually intended to preserve union jobs. However, because significant record evidence of these surrounding circumstances indicated that the May 1999 agreement did not have an impermissible purpose, the plain text of the agreement is not substantial evidence supporting the Board's conclusion.

As just noted, the Supreme Court has instructed that "[w]hether an agreement is a lawful work preservation agreement depends on 'whether, under all the surrounding circumstances, the Union's objective was preservation of work for bargaining unit employees, or whether the agreement was tactically calculated to satisfy union objectives elsewhere.'" Longshoremen, 447 U.S. at 504 (emphasis added) (quoting Nat'l Woodwork, 386 U.S. at 644-45). Although the NLRB's decision recites this important principle, it ignores record evidence shedding light on the intent behind the May

_____

using Cullion, and thus all negotiations between the parties after that point focused on Northeast. The April 2001 strike was triggered by Lynch's continued use of Northeast, and thus the question of whether the union's conduct in connection with the strike violated section 8(b)(4) of the Act turns on whether the prohibition on using Northeast was valid.

1999 agreement and focuses instead on the specific identification of Northeast and Cullion by name in the agreement, and on the fact that the agreement did not bar all subcontracting or limit subcontracting to companies that paid the prevailing rate:

> The May 1999 agreement did not wholly prohibit J.H. Lynch from subcontracting work performed by its own employees. Nor did it limit subcontracting to companies that paid their employees wages and benefits commensurate with those required by J.H. Lynch's collective-bargaining agreement with the Respondent. Rather, it permitted subcontracting generally, but prohibited it only to two specific companies . . . , both of which were not parties to an agreement with [Local 251]. That the May 1999 agreement does not bar all subcontracting or name any other companies - despite the fact that [Local 251] was aware J.H. Lynch used other subcontractors - belies [Local 251's] contention that its primary dispute was with J.H. Lynch and not with Northeast or Cullion.

However, the circumstances surrounding the May 1999 agreement indicate that it was intended to enforce the union standards clause in the collective bargaining agreement between the parties, and thus preserve union jobs. Most importantly, record evidence indicated that Northeast and Cullion were identified by name in the May 1999 agreement because they were the only two subcontractors that failed to pay the prevailing rate.

Lynch and the Board make much of the fact that the union was aware that Lynch used other subcontractors aside from Northeast and Cullion. Lynch argues that, given this fact, singling out those two companies indicates that the May 1999 agreement was

-18-

intended to achieve union objectives with those companies and not to preserve work at Lynch. However, the relevant inquiry is not whether Lynch used other subcontractors, but whether Lynch used other subcontractors that failed to pay the prevailing rate. There is record evidence, in the form of testimony at the hearings before the ALJ, that, as of May 1999, these were the only subcontractors used by Lynch that failed to pay the prevailing rate. Lynch and the Board have pointed to no evidence to the contrary. Thus understood, identification of these two companies in the May 1999 agreement is consistent with the proposition that the union's primary dispute was with Lynch, and not with these two companies.

Additionally, the NLRB failed to consider other surrounding circumstances showing that the agreement was intended to preserve Local 251 jobs at Lynch. In particular, the NLRB's decision ignores evidence regarding repeated meetings between Boyajian and Lynch officials concerning the use of subcontractors who did not pay the prevailing rate. Boyajian testified that he raised the issue several times between 1997 and 1999, and that the gist of these conversations was that Lynch's use of Northeast drivers who did not receive the prevailing rate was costing bargaining unit jobs. In fact, David Lynch testified that during the 2001 strike intended to enforce the May 1999 agreement, he met with Boyajian and the parties reached a tentative agreement. Describing the terms of the agreement, Lynch testified that

-19-

Boyajian told him that Lynch could not use Northeast, but "if you are going to use Northeast, you have to pay health and welfare to use them and you'll be all set." Similarly, Boyajian testified that the understanding between the parties was that Lynch was <u>not</u> absolutely prohibited from using Northeast, but that, if it chose to use Northeast, it would pay drivers the prevailing rate. This is powerful evidence that the May 1999 agreement was intended to preserve Local 251 jobs at Lynch, rather than achieve union objectives with respect to Northeast. None of this evidence is discussed in the NLRB's decision.

The factors identified by the Court in <u>National Woodwork</u> also suggest that this agreement was intended to preserve bargaining unit work. <u>See</u> 386 U.S. at 644 n.38 (identifying threat of displacement, history of labor relations, and economic personality of the industry as factors to be considered). Local 251 members faced a real threat of displacement by Northeast subcontractors, as illustrated by the diminishing size of the Local 251 bargaining unit at Lynch and the increased use of subcontractors. The Board never mentions this fact. Furthermore, there is nothing in the record suggesting a history of strained labor relations between Local 251 and Northeast, and no reason to believe that the union had some reason for specifically targeting Northeast. In contrast, there is a long history, extensively documented in the record, of disputes between the union and Lynch

-20-

concerning the use of subcontractors that did not pay the prevailing rate.

As the NLRB acknowledged in its decision, "an agreement that permits an employer to subcontract bargaining unit work only to subcontractors that honor the economic terms of the collective-bargaining agreement serves a lawful primary purpose -- eliminating any economic incentive to take work away from employees in the unit."  In this case, the May 1999 agreement between Local 251 and Lynch is precisely this sort of agreement.  It identified Northeast and Cullion by name because, at that time, those were the only subcontractors that did not pay the prevailing wage.  Thus the agreement was tailored to directly address the practice that the union believed threatened bargaining unit work and violated the collective bargaining agreement.[6]

Therefore, both prongs of the Court's test for identifying lawful work preservation agreements are present here -- the objective of the agreement is to preserve bargaining unit work and the party with whom the agreement is made, Lynch, has the power to assign employees the work in question.  See Longshoremen, 447

_____

[6] We note that the May 1999 agreement is memorialized in an informal letter from David Lynch to Boyajian.  Given this fact, it is all the more likely that this letter reflects the parties' discussions about the use of these particular subcontractors that did not pay the prevailing wage, and it is unsurprising that such a letter is not a precisely worded expression of the complete understanding between the parties.  It is an oddity of this case that the union is held liable for the specific language in a letter authored by the employer.

U.S. at 504. The NLRB reached a different conclusion only because it focused on the face of the agreement and ignored evidence of the surrounding circumstances. In light of these circumstances, the plain text of the May 1999 agreement is not substantial evidence supporting the Board's conclusion. See Howard Johnson, 702 F.2d at 2 (stating that substantial evidence review requires that one "take contradictory evidence in the record into account" (quoting Universal Camera, 340 U.S. at 487-88)). Accordingly, we reverse the Board's decision with respect to that portion of the May 1999 agreement concerning Northeast and we reinstate the finding of the ALJ that the May 1999 agreement did not violate section 8(e) of the Act with respect to Northeast.

Finally, both the ALJ and the Board note that, because the 2001 strike was intended to enforce the May 1999 agreement, the lawfulness of the strike depends on the lawfulness of the agreement. Thus, the ALJ found that the 2001 strike did not violate section 8(b)(4) of the Act, while the Board found that it did. Because we conclude that the Board's decision was not supported by substantial evidence, and that the May 1999 agreement did not violate section 8(e) of the Act with respect to Northeast, we also conclude that the 2001 strike, which concerned only the use of Northeast subcontractors, did not violate section 8(b)(4) of the Act.

**B.  Portions of the ALJ's Decision Unaddressed by the Board**

The Board chose not to address certain issues raised by the parties in its initial review of the ALJ's decision.  In particular, it declined to consider issues raised by Local 251's alleged threats to strike or conduct informational picketing targeting other employers.  The ALJ found that these threats violated section 8(b)(4)(ii)(B) of the Act, but the NLRB explained that "[w]e find it unnecessary to pass on the judge's findings that the [union] also violated Sec. 8(b)(4)(B) by . . . threats [to other employers] . . . .  Even if those alleged violations were found, they would be cumulative to the other 8(b)(4)(B) threat . . . [based on the May 1999 agreement], which we find." Similarly, the Board also declined to consider an argument that the strike was unlawful because it sought to enforce another provision of the CIRI collective bargaining agreement that was itself alleged to be unlawful, explaining that because it found the strike unlawful on other grounds it need not reach this issue.

For whatever reason, the Board has not asked that the case be remanded for it to consider these previously bypassed issues if we reject any portion of its application for enforcement. Accordingly, we decline to do so and deem any such argument waived. See SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010) ("[W]e deem abandoned all arguments that have not been briefed and developed on appeal.").  We make exceptions to the waiver doctrine only in

-23-

"exceptional" circumstances.  See Banco Bilbao Vizcaya Arg. v. Wiscovitch-Rentas, 625 F.3d 34, 41 (1st Cir. 2010) (quoting Nat'l Ass'n of Social Workers v. Harwood, 69 F.3d 622, 627 (1st Cir. 1995)) (internal quotation mark omitted).  No such circumstances are present here.  It took the NLRB nine years to decide this case in the first instance, and, when it did so, it declined to consider all of the issues raised, dismissing many as cumulative. Giving it another opportunity to consider these previously ignored issues would cause inequity to the parties awaiting final resolution of this dispute, see id., and the Board has not pressed any exceptional circumstances that would cause us to deviate from our usual application of waiver rules.

## C. Enforcement of the Remaining Portion of the Board's Order

Finally, because Local 251 has not challenged the NLRB's decision that the May 1999 agreement violated section 8(e) of the Act with respect to its prohibition against use of Cullion, we conclude that the Board is entitled to enforcement of that portion of its order.  Accordingly, we grant the Board's application for enforcement of its order insofar as the order bars the May 1999 agreement's prohibition on use of Cullion subcontractors and requires Local 251 to take remedial action.

We find unpersuasive the union's argument that enforcement of the Board's order is inappropriate because of the passage of time.  As the Supreme Court has explained, "[i]nordinate

-24-

delay in any case is regrettable, but Congress has introduced no time limitation into the Act except that in [section] 10(b)."[7] NLRB v. Katz, 369 U.S. 736, 748 n.16 (1962). That said, if the passage of time leads to changed circumstances rendering enforcement of the Board's order unfair, unnecessary, or otherwise inappropriate, we will decline to enforce an order of the Board. See NLRB v. LaVerdiere's Enters., 933 F.2d 1045, 1054-55 (1st Cir. 1991); Emhart Indus. v. NLRB, 907 F.2d 372, 379 (2d Cir. 1990) ("[W]e must withhold enforcement of orders that will not effectuate any reasonable policy of the act, even where the problems with the order are caused primarily by the lapse of time.").

Despite the lengthy delay here, the union has failed to demonstrate that changed circumstances make enforcement unfair, unnecessary, or inappropriate. In order to justify a decision not to enforce an order, courts have previously identified events such as decertification of the union, closure of the relevant plant, or an agreement between the parties resolving the dispute. See NLRB v. Mountain Country Food Store, Inc., 931 F.2d 21, 22-23 (8th Cir. 1991); Emhart, 907 F.2d at 379-80. The union has identified no such facts in this case.

---

[7] In relevant part, section 10(b) of the Act provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made." 29 U.S.C. § 160(b).

In our assessment of the Board's decision to bypass a number of issues raised by the ALJ's decision, we noted that the passage of time was a relevant factor in our decision not to remand the case to the Board for resolution of those issues. There we were confronted with the likelihood of another lengthy delay.[8] In contrast, here we ask not whether another delay is acceptable, but rather whether the time already passed renders enforcement of the Board's order inappropriate. As noted, the union has failed to show why that is the case here.

**IV.**

For the reasons set forth, we <u>grant</u> Local 251's cross-petition for review of the Board's order. Having done so, we <u>deny</u> the Board's application for enforcement of its order with respect to the May 1999 agreement's prohibition on use of Northeast. However, we <u>grant</u> the application for enforcement of the order insofar as the order bars the May 1999 agreement's prohibition on use of Cullion subcontractors and requires Local 251 to take remedial action. The parties shall bear their own costs.

<u>So ordered</u>.

---

[8] Our conclusion regarding the status of the May 1999 agreement affirms the lawfulness of the union's 2001 strike against Lynch, and thus allows for resolution of the suit concerning this strike currently pending before the United States District Court for the District of Rhode Island.